**TYLER BOX & LUMBER MFG. CO. v. CITY NAT. BANK OF PARIS et al. (No. 1587.)**

·(Court of Civil Appeals of Texas. Texarkana. March 16, 1916.)

1. SALES ⊚⇒89—MODIFICATION OF CONTRACT —CONSIDERATION.

Where defendant contracted to purchase ·all the cottonwood veneer cut by plaintiff for egg cases for the season of 1913 and 1914, a modification of the contract, relieving the defendant of any obligation to take more than it could use in its business in those seasons, and relieving the plaintiff of its obligation to sell all the material cut by it and to turn over orders it might receive for egg cases, rested upon mutual consideration, and the contract might have been modified without a new consideration; the consideration of the original contract ·being sufficient.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259; Dec. Dig. ⊚⇒89.]

·2. TRIAL ⊚⇒252(12) — INSTRUCTIONS — EVIDENCE.

In an action under a contract to sell all the veneer cut by plaintiff to defendant for two seasons and to turn over orders for egg cases to defendant, testimony that plaintiff, on defendant's request, would reduce the output of its plant so as not to overstock defendant with material did not show a modification of the contract, under which the plaintiff had the right, at any time, to reduce its output, so that the refusal of plaintiff's charge, based thereon, that the jury should find for it, on the theory that the defendant was bound to receive and pay for the reduced output, was properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 604; Dec. Dig. ⊚⇒252(12).]

3. TRIAL ⊚⇒251(4) — INSTRUCTIONS — ACTION FOR BREACH OF CONTRACT—PLEADING AND ISSUES.

In such case, even if the testimony had shown a modification of the original contract, the refusal of plaintiff's request on that theory would have been proper, where there was no pleading by plaintiff which could have authorized the submission of such issue.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 591; Dec. Dig. ⊚⇒251(4).]

4. PARTNERSHIP ⊚⇒218(3) — DENIAL — STATUTE.

In an action on a contract for the sale of veneering for the manufacture of egg cases brought against a bank and its president as partners, where neither the bank nor the president denied their partnership under oath, as required by Vernon's 'Sayles' Ann. Civ. St. 1914, art. 1906, a peremptory instruction to find in favor of the president, because it was not shown that he had any connection with the contract other than as agent of the bank, especially in view of the admission of partnership in their answer, was erroneous.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 427; Dec. Dig. ⊚⇒218(3).]

5. APPEAL AND ERROR ⊚⇒1062(3)—HARMLESS ERROR—INSTRUCTION.

Such error in the instruction was harmless, since if they were partners and the bank was not liable, as was found by the jury, the individual defendant as its partner could not have been liable, and a 'finding against him would have been unauthorized.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4214; Dec. Dig. ⊚⇒ 1062(3).]

6. APPEAL AND ERROR ⊚⇒1040(14)—HARMLESS ERROR—INSTRUCTION—ISSUES.

In an action on a contract, error in overruling plaintiff's exception to a part of the defendant's answer was harmless, where the matter set up in the paragraph as a defense was not submitted to the jury as constituting a defense.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4102, 4105; Dec. Dig. ⊚⇒ 1040(14); Pleading, Cent. Dig. § 567.]

Error from District Court, Lamar County; A. P. Dohoney, Judge.

Action by the Tyler Box & Lumber Manufacturing Company against City National Bank of Paris, Tex., and T. J. Record. Judgment for defendant bank, and the plaintiff brings error. Affirmed.

Plaintiff in error, the Tyler Box & Lumber Manufacturing Company, which will be called the "Tyler Company," was engaged in the business of manufacturing and selling egg cases, etc., at Tyler, Tex. The Paris Box & Manufacturing Company was engaged in the same business at Paris, Tex. In 1911 the last-mentioned company became bankrupt and its manufacturing plant sold by the trustee in bankruptcy to the defendant in error, the City National Bank of Paris, one of its creditors. Thereafterwards the bank, of which defendant in error Record was president, in the name "Paris Box & Lumber Company," carried on the business of manufacturing egg cases, etc., for the purpose of recouping its loss as a creditor of the bankrupt concern. July 17, 1913, the Tyler Company and the bank, in said name of Paris Box & Lumber Company, entered into a contract as follows:

"Paris, Texas, July 17, 1913.

"This is a contract between the Paris Box & Lumber Co. of Paris, Texas, and the Tyler Box & Lumber Co. of Tyler, Texas, hereinafter referred to as the Paris Co. and the Tyler Co. respectively.

"The Paris Company hereby purchases from the Tyler Company all the cottonwood veneer cut by it for the season of 1913 and 1914, for the price of five and one-half (5–½) cents per set of one top, one bottom and two sides, f. o. b. cars the factory of the Paris Co. and of the dimensions suitable for standard egg cases; veneers cut sufficiently long and wide to allow cutting off and ripping.

"The Paris Co. agrees to pay for same at above price within ten days from date of receipt of invoice and bill lading less 2% after deducting freight from said price.

"The Tyler Company hereby sells to the Paris Co. all the cottonwood veneer cut by it for the period from this date to the first day of August, 1914, for the price of five and one-half (5–½) cents per set. At least one hundred thousand sets must be delivered by November 1, 1913, and one hundred thousand sets by the 15th day of March, 1914. Said veneer to be cut from live cottonwood of such dimensions and so that by ripping one side and equalizing the ends they will make one piece sides and tops, and at least

two-thirds of bottoms one piece, balance of bottoms may be two pieces.

"The Tyler Company will turn its orders for egg cases to the Paris Company and will assist it in selling to the trade.

"Signed by the Paris Box & Manufacturing Co., per W. J. Reed, Mgr., and T. J. Record; and by the Tyler Box & Lumber Co., per B. C. Anderson."

The suit was by the Tyler Company against the bank and Record for damages it claimed it suffered because of a breach by them, it alleged, of the contract, in that they refused to receive when tendered, and pay for, veneer cut by it during the life of the contract, as they had agreed to do. The bank and Record claimed that the contract sued upon was modified by an agreement made in February, 1914, and that they had complied with it as so modified. The fifth paragraph of the answer of the bank and Record, and a part of the sixth paragraph, which sets up the modification of the contract as claimed by them, are as follows:

"Defendants admit the making of the contract set out by plaintiff in paragraph 15 of its petition; but they say that at the time said contract was entered into, it was contemplated and understood by the parties making same that the Paris Box Factory would not be obligated to take more cottonwood veneer than would be necessary to manufacture such egg cases that could be sold to the trade within the time specified in said contract; that the contract, as written, by its terms obligates defendants to take all the cotton veneer cut by plaintiff for the season 1913 and 1914, but, as above alleged, it was fully understood and agreed that the Tyler concern would not cut, or expect the Paris Box Factory to take, any more stuff than would be necessary, as above stated, to supply the demand for egg cases.

"The defendants further say that up to the 28th day of February, A. D. 1914, the Tyler Box Factory had shipped to the Paris Box Factory large amounts of veneer to be used in the manufacture of egg cases which had been received by the Paris Box Factory and paid for according to the terms of the contract; that on or about said 28th day of February a representative of the Tyler Box Factory, having full authority to represent it in its business with the Paris Box Factory, came to the city of Paris, and he and the representative of the Paris Box Factory made and agreed on a settlement of its business relations up to said date, including a settlement of accounts for the period ending July 17, 1913; that the attention of the agent and representative of the Tyler Box Factory was called at the time to the contract set out by plaintiff, in which the Paris Box Factory had agreed to take all the cottonwood veneer cut by the Tyler Box Factory for the season of 1913 and 1914, and such representative and agent then stated that it was not contemplated by the parties to the contract that the Paris Box Factory should take more than sufficient for its needs, and that the Tyler Box Factory did not expect the Paris Box Factory to take more than it could find a market for. T. J. Record, representing the box factory, again called his attention to the wording of the contract, whereupon it was agreed that that part of the contract which obligated the Paris Box Factory to take all the cottonwood veneer cut by it for the season of 1913 and 1914 should be abrogated and rescinded, and that thereafter the contract should be that the Paris Box Factory should take all the veneer from Tyler Box Factory that it could use in its business for the season and no more."

185 S.W.—23

The testimony offered on behalf of the bank and Record was sufficient to support a finding that the contract was changed as alleged by them.

Because the Tyler Company failed to prove that Record had any connection with the contract sued upon, except as agent of the bank, the trial court instructed the jury to find in his favor. With reference to the controversy, so far as it was between the Tyler Company and the bank, the court instructed the jury to find in favor of the former, unless they believed the contract sued upon was "modified by an oral agreement made subsequent to" its date, and to find for the bank if they believed—

"that on or about February 28, 1914, John M. Wright, representing the plaintiff the Tyler Box & Lumber Manufacturing Company, made a verbal agreement with T. J. Record, representing the defendant, City National Bank of Paris, Tex., by the terms of which the provisions of the written contract aforesaid, requiring the Paris Box & Lumber Company to take the entire output of veneer for egg cases of the plaintiff's factory for the season of 1913 and 1914, should be abrogated and rescinded, and that thereafter the contract should be that the Paris Box Company should take all the veneer from the Tyler Box Company that it could use in its business for said season, and no more, and that thereafter said Paris Box & Lumber Company did take from the plaintiff all such veneer that it could use in its said business, for said season."

The jury found in favor of the bank; judgment that the Tyler Company take nothing by its suit was rendered.

Burdett, Connor & Dailey, of Paris, and Simpson, Lasseter & Gentry, of Tyler, for plaintiff in error. Park, Moore & Hardison, of Paris, for defendants in error.

WILLSON, C. J. (after stating the facts as above). The negotiations resulting, as claimed by the bank and Record, in the modification, as alleged by them, of the contract sued upon, were between Record, representing the bank, and John M. Wright, representing the Tyler Company. Record testified that the change was agreed upon February 28, 1914, after he and Wright had adjusted accounts existing between the bank and the Tyler Company growing out of another contract between them.

He further testified:

"The egg-case business was getting late, the season was far advanced on the last day of February, and we talked about the condition, and Mr. Wright told me to have no anxiety about it, he was not going to overstock us, it was as much against his interest to overstock us as it was against our interest to be overstocked. * * * I said: 'Mr. Wright, you say you are not going to overstock us, that is very nice, but we want to understand each other.' I got the contract and read to him that part of which obligated the Paris Box Factory to take all the veneer the Tyler Box Company could cut during the life of the contract. Wright said, 'the real agreement never contemplated that the Paris Box Factory should take more than it could use during the season, and we do not want you to take more veneer than you can use.' I then said: 'Let's fully understand each oth-

er, do you agree that that part of the contract which requires us to take all the cut shall be modified and rescinded, and that hereafter the contract shall be that the Paris Box Factory shall take all the veneer from the Tyler Box Factory, that it can use for the season, and no more?' Wright replied that 'We do so agree,' and added that he would like for us to take a car occasionally, as he wanted to keep a small crew at the plant. I told him we would use all we could, and hoped the egg-case business would pick up, and that we would be able to use more veneer than it now appeared, and he said: 'I think the business will improve, and that you will need more than you now expect you will use.' That was on the 28th of February, and early in March we wrote him and told him to hold up shipments, and on the 25th of March, I believe, we told him we could not handle any more, and asked to discontinue. That is the agreement that was made between Mr. Wright and I on the 28th of February. From the time Mr. Wright was here until we notified them to hold up, they shipped us 10 cars. On the 3d of March they shipped a car, 10,560 sets; on March 5th a car, 11,700 sets; another on the 5th of March, 12,700 sets; two on March 10th, one 8,666 sets, and the other 8,500 sets; two on the 16th of March, one 12,-000 sets, and the other 12,290; two on the 17th of March, one 12,870, and the other for 11,535; and then they skipped until the 25th of March when they shipped us one car of 7,537 sets. That aggregated 108,352 sets. That was after Mr. Wright and I agreed on a car occasionally. We made every effort possible to use all the veneer possible in our business, and we did all we could. I think we had between 75,000 and 100,000 sets that we could not use and had to carry over. At the time we made the new contract we probably had that number of sets on hand that we bought and paid them for. After Mr. Wright was here and we had that agreement, we carried over about 65,000 sets that we could not use. We paid for all that veneer. In other words, we tried to buy enough to run on, and we had 65,000 sets more than we sold, I believe it was 65,900 sets; I don't know exactly, so I'll say about 65,000."

[1] The Tyler Company insists that the agreement shown by the testimony set out above was not binding upon it, because, it asserts, the modification of the contract sued upon, claimed to have been thereby accomplished, was without a consideration to support it. We do not think so. While the bank was thereby relieved of any obligation to take more of the material than it could use in its business for the season covered by the contract, the Tyler Company was relieved of its obligation to sell to the bank all the material cut by it, and to turn over orders it might receive for egg cases to the bank. It seems to us, therefore, it cannot be said that there was no consideration, or a lack of mutuality in the consideration, for the modification claimed. 1 Page on Contracts, 302, 308. It has been said that a contract like the one sued upon "may be modified without a new consideration, the consideration of the original contract being deemed sufficient." 35 Cyc. 124; City of Ft. Madison v. Moore, 109 Iowa, 476, 80 N. W. 528; Fiber Co. v. Lumber Co., 132 Wis. 1, 111 N. W. 241; Bowman v. Wright, 65 Neb. 661, 91 N. W. 581, 92 N. W. 580; Strahl v. Grocer Co., 5 Neb. (Unof.) 482, 98 N. W. 1043; Prye v. Kalbaugh, 34 Utah, 306, 97 Pac. 333; Hertz v.

Pub. Co., 9 Ala. App. 178, 62 South. 567. We do not understand the ruling made in the cases decided by the courts in this state, and cited by the Tyler Company, as being to the contrary, except the one made in Terrell v. Proctor, 172 S. W. 1000, where it was said by the Court of Civil Appeals that:

"In some states the courts have held that the consideration existing in an original executory contract is considered as imported into any new parol modification, and no new consideration need be shown, but we do not understand our courts to so hold. Whitsett v. Carney, 124 S. W. 443; Walker v. Tomlinson, 44 Tex. Civ. App. 446, 98 S. W. 906; Mayfield v. Cotton, 21 Tex. 1; Hogan v. Crawford, 31 Tex. 633; Bonzer v. Garrett, 162 S. W. 936; Consumers' Fertilizer Co. v. Badt & Co., 157 S. W. 226; Porter v. Metcalf, 84 Tex. 468, 19 S. W. 696."

While the cases cited in the quotation from the opinion in the Proctor Case set out above do not hold that the consideration of an executory contract will support a modification thereof agreed upon by the parties, they do not, as we understand them, when considered with reference to their respective facts, hold to the contrary, and we are of opinion that the rule recognized by courts in other jurisdictions is the true one. It follows that we think the assignments numbered 2, 3, 4, and 14 in the Tyler Company's brief should be overruled.

[2, 3] The witness Wright testified that the agreement of February 28, 1914, between himself, representing the Tyler Company, and Record, representing the bank, was not as testified to by Record, but was that the Tyler Company, when requested by the bank to do so, would so reduce the output of its plant as to not overstock the bank with material. The court refused a special charge asked by the Tyler Company, based on this testimony and on testimony showing that thereafterwards the Tyler Company did reduce the output of its plant, directing the jury to find for it on the theory that the bank was bound to receive and pay for the reduced output of the plant. We think the refusal of the charge was not error. Under the contract as made originally the Tyler Company had a right, without any agreement on the part of the bank, to reduce the output of its plant, for it had not bound itself not to do so. The testimony of Wright, therefore, did not show a modification of the original contract. If it had shown one, then it would not have been error to refuse the charge, because there was no pleading on the part of the Tyler Company which would have authorized the submission of such an issue to the jury. The eleventh assignment therefore is overruled.

[4, 5] The suit was against the bank and Record as partners. There was no denial, under oath, by either the bank or Record of the partnership, as was required by the statute. Article 1906, Vernon's Statutes. It is insisted that the court therefore erred when he peremptorily instructed the jury to find in favor of Record, because it was not shown that he had any connection with the trans-

action evidenced by the contract, other than as the agent of the bank. For the reason urged, and also because of the admission in the second paragraph of the bank and Record's answer that they were partners in the business of manufacturing egg cases as charged in the ninth paragraph of the petition, the instruction, doubtless, was error; but the error was harmless, because, if they were partners and the bank was not liable, as was determined by the jury, Record as its partner could not have been liable, and a finding against him would have been unauthorized.

It is believed the court did not err in refusing to give to the jury the special charge numbered 2, requested by the Tyler Company. Neither the original contract, nor that contract as modified, according to the testimony, required the bank to give notice to the Tyler Company before it did that it could not use more of the material than it accepted and paid for.

[6] What has been said disposes of all the assignments except the first, in which the Tyler Company complains of the action of the court in overruling its exception to the fifth paragraph of the bank and Record's answer. The action of the court, if erroneous—and we think it was—was harmless, for the matter set up in that paragraph as a defense to a recovery by the Tyler Company, as it sought, was not submitted to the jury as constituting a defense to the suit.

The judgment is affirmed.